# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 628 | **DATE** | 6/19/2001 |
| **CASE TITLE** | JOE STEWART vs. GENERAL MOTORS CORPORATION | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: Defendant GM's motion for summary judgment on plaintiff's four count complaint brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), et seq., for sexual harassment, individual disparate treatment and retaliation, is GRANTED (#26-1). This case is terminated and this is a final and appealable order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | JUN 2 2 2001 date docketed | 33 |
| ✓ | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| CG | courtroom deputy's initials | ED-7 FILED FOR DOCKETING 01 JUN 21 PM 5:50 Date/time received in central Clerk's Office | date mailed notice mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOE STEWART, )
)
)
Plaintiff, )
) No. 99 C 0628
v. ) Judge Ronald A. Guzman
)
)
)
GENERAL MOTORS CORPORATION )
)
)
Defendant. )

**DOCKETED**
**JUN 2 2 2001**

## MEMORANDUM OPINION AND ORDER

Before this court is defendant General Motors Company's ("defendant or GM") motion for summary judgment on plaintiff Joe Stewart's ("plaintiff or Stewart") four count amended complaint brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), et seq., for hostile environment sexual harassment, sex discrimination, and retaliation. For the following reasons, the defendant's motion is granted.

## BACKGROUND FACTS

GM is located in Broadview, Illinois. GM receives and distributes automotive and light truck parts to dealerships through the Midwest. Plaintiff Joe Stewart is currently employed at GM as a clerk in the shipping department and has worked for GM since 1964. Plaintiff received an Associates of Arts degree from Malcolm X College, a Bachelor of Arts from Roosevelt University, Masters of Arts from Governor's State University and a Ph.D. in psychology from the

1

Union Graduate School of Cincinnati Ohio. Plaintiff is responsible for checking orders for accuracy and makes corrections if necessary. The area where plaintiff works is a strategic area which is restricted to clerks and supervisors.

Plaintiff filed two charges of discrimination ("the Charge") with the Equal Employment Opportunity Commission ("EEOC") on or about July 27, 1998 and January 26, 1999. The charges allege that Plaintiff was: (i) discriminated against on the basis of his sex; (ii) retaliated against for filing charges of discrimination; and (iii) subjected to sexual harassment by one of his co-workers, all in violation of Title VII. The EEOC issued Plaintiff right-to-sue letters in November 4, 1998 and February 4, 1999 respectively.

GM has a policy against harassment which states in relevant part:

All employees are expected to deal fairly and honestly with one another to ensure a work environment free of intimidation and harassment. Abuse of the dignity of anyone, through ethnic, racist or sexist slurs or through other derogatory or objectionable conduct, is offensive employee behavior... This type of conduct will not be tolerated in the workplace.

GM's sexual harassment policy states that an employee who believes he or she has been subject to sexual harassment should report such conduct to a supervisor or the personnel representative for the facility. The policy further provides that "other appropriate and existing complaint producers also can be utilized." Since at least 1990, GM has posted its sexual harassment policy at the main employee entrance to the facility and the internal entrance to the front office area of the facility.

Beginning in 1995, the Company conducted mandatory Equal Application Training for all of its hourly employees and supervisors. As part of the Equal Application Training, all hourly employees and supervisors were given the "Faces of Cooperation: Respecting and Valuing Our

Differences" Booklet. The sexual harassment policy was reproduced in part and distributed to all employees as part of the Faces of Cooperation training.

Also as part of the Equal Application Training, all employees were required to attend group training. During this training, employees viewed a film based on the Faces of Corporation Booklet ("the Film"). The Film provides employees with an introduction to what sexual harassment is and informs them that it is prohibited by law. Between segments of the Film, UAW and GM training coordinators moderated discussions based upon vignettes portrayed in the Film.

During 1997, GM published a booklet for employees titled, "Sexual Harassment/Hostile Environment: Working Relationships - What General Motors Employee Should Know"(hereinafter "the Harassment Booklet"). The Harassment Booklet sets forth the Company's policy against sexual harassment and instructs employees who believe they have been subjected to harassment to bring such concerns to the attention of an immediate supervisor, personnel director, personnel representative or union representative, or to use appropriate and existing internal complaint procedures. The harassment Booklet also provides guidance to employees on how to recognize harassment and the consequences of harassment. During the latter half of 1997, the Harassment Booklet was distributed to all Chicago GM employees. On or about April 19, 1999, GM once again conducted mandatory Equal Application Training for all of its hourly employees and supervisors.

Since in or about 1980, the United Auto Workers Union ("U.A.W.") has represented the hourly employees at the Broadview plant. The U.A.W. and GM are parties to a collective Bargaining Agreement ("the Labor Agreement") which govern the terms and conditions of

employment for hourly employees. Paragraph 6(a) of the Labor Agreement provides:

> It is the policy of General Motors and the UAW that the provision of this Agreement be applied to all employees covered by this Agreement without discrimination based on race, color, religion, age sex, national origin or individuals with disabilities as required by appropriate state and federal law. Any claims of violation of this policy, claims of sexual harassment or of any laws regarding discrimination or harassment on account of disability may be taken up as a grievance.

Paragraph 6(a) of the Labor Agreement was reproduced in part and distributed to all employees in 1995 and 1999 at pages 3-4 of the Faces of Cooperation training Booklet. The sexual harassment policy has been published in the Labor Agreement since at least 1990.

Pursuant to the Labor Agreement, the U.A.W. and the Company created National and Local Equal Application Committees in 1973. One of the functions of the Equal Application Committees is to investigate allegations of violations of the Company's EEO and/or sexual harassment policies. A description of the existence, purpose and function of the Equal Application Committees was also reproduced and distributed to all employees in 1995 and 1999 as part of the Faces of Cooperation training. During 1998, the Local Equal Application Committee at GM was composed of the Plant Manager, the supervisor of Labor Relations, the President of the Local U.A.W's Civil Rights Committee Chairman and the Shop Committee Chairman.

On July 8, 1998, Plaintiff verbally reported to his supervisor, John O'Donnell, an incident that occurred in the Company restroom with Mike Sinks, a co-worker. This incident had occurred one to two weeks earlier. Plaintiff told O'Donnell, "I'm reporting to you that this man has been touching me inappropriately a number of times.... He has done it again, and this time it's got to stop." Plaintiff then reported the following to O'Donnell: Plaintiff was standing in the

bathroom with his pants down when Sinks, who was fully clothed, forced the mid-section of his torso against Plaintiff's buttocks in a simulated act of sodomy. Plaintiff fell forward and caught himself by reaching out for the wall. He screamed and looked behind him, saw Sinks and asked him "what the heck [he] was doing." Sinks did not say anything, but turned around and ran out of the bathroom.

O'Donnell immediately called Plaintiff's Union committeeman, John Daley, and asked Plaintiff to meet them in the Supervisor's office so they could further discuss the incident. During the meeting with Daley and O'Donnell, Plaintiff again reported that Sinks "hit" him from behind while he was in the bathroom. Plaintiff further reported that he caught the wall, turned around and asked Sinks "what the hell [he] was doing." Sinks did not say anything, but immediately ran out of the washroom. During this same meeting, Plaintiff also told Daley and O'Donnell that Sinks had previously messed Plaintiff's hair and beat his desk with a rubber mallet. According to Plaintiff, on prior occasions Sinks had beat on his desk with a rubber mallet while saying, "I'm whipping your pussy" and I'm whipping your bitch." Sinks was referring to a picture of a cat and a picture of a dog which belonged to one of Plaintiff's co-workers. Plaintiff knew the identity of the co-worker, but never had asked her to remove the pictures, nor did he attempt to remove the pictures himself.

In response to Plaintiff's complaint, Daley told O'Donnell that the pictures of the dog and the cat would be removed. O'Donnell agreed, stating "We're going to have to get them off." The pictures were subsequently removed.

O'Donnell interviewed Sinks. Sinks denied that the incident described by Plaintiff in the bathroom took place, but admitted he may have bumped into Plaintiff in the bathroom. Sinks

5

also told O'Donnell he was joking around when he bumped into Plaintiff and that he bumped into other co-workers in the bathroom while they were urinating as a joke.

O'Donnell and Daley told Plaintiff they would investigate his allegations concerning the bathroom incident with Sinks and report back to him. O'Donnell investigated the incident further, but no other employees claimed to have any knowledge of the incident that supposedly occurred in the bathroom. On July 20, 1998, at Plaintiff's request Daley filled out two grievance forms complaining of violations of the provisions of the Labor Agreement that prohibit discrimination and harassment.

On July 21, 1988, O'Donnell and Daley held a second meeting with Plaintiff regarding the alleged bathroom incident. At the second meeting, Daley informed Plaintiff that he had interviewed Sinks about the bathroom incident. O'Donnell informed Plaintiff that Sinks would apologize to him and that steps were being taken to correct the situation. Plaintiff did not indicate whether he was satisfied or dissatisfied with the manner in which his complaint was being handled and investigated, nor did he indicate whether he thought Sinks should be disciplined for the bathroom incident. Plaintiff "made no requests on those issues" because "[t]hat was up to management and the union."

After the second meeting, Sinks approached Plaintiff and apologized for making contact with him in the bathroom. Also after the second meeting, O'Donnell told Sinks to stay away from Plaintiff and not to interact with Plaintiff.

A third meeting was held on or about September 8, 1998, in furtherance of the investigation of Plaintiff's complaint about the bathroom. Stewart; O'Donnell; Daley; Supervisor of Labor Relations; Harold Brabbs; Supervisor of Personnel, and Roy Tolbert, then

6

Chairman of the Local UAW's shop committee, attended the September 8, 1998, meeting. During the third meeting, Brabbs and Tolbert each asked Plaintiff about the bathroom incident. Plaintiff described his allegations to both men.

During this meeting, Plaintiff not indicate that he had any problems with Sinks over the approximately two months since the date of the alleged bathroom incident. Plaintiff did not report that Sinks touched him, said anything to him or sexually harassed him between July 8 and September 8, 1998. The only conduct Plaintiff supposedly reported during this time was Sink's use of a printer and making animal noises:

The Equal Application Committee met to evaluate the investigation of Plaintiff's allegations. Plant Manager Steve Clifford, Supervisor of Labor relations Harold Brabbs, Shop Committee Chairman Roy Tolbert, UAW Local President D. Gurzynski and Civil Rights Committee Chairman S. Woodson, attended the meeting.

The Equal Application Committee was unable to conclude whether Sinks had actually engaged in the conduct of which Plaintiff complained or whether any sexual harassment occurred. The Equal Application Committee relied on several factors, including inconsistencies in Stewart's various renditions of the bathroom incident. The Committee observed that when Stewart first reported the incident to O'Donnell, he claimed he was standing at a urinal when Sinks bumped into him. In his charge of discrimination, Steward again asserted he had been standing at the urinal when Sinks bumped into him. When Stewart described the incident to Brabbs and Tolbert, he said he was in a bathroom stall with the door open, rather than standing at a urinal, when Sinks bumped him. In reaching its conclusion, the Committee also relied upon the lack of fact witnesses, Sinks's denial that the incident described by Plaintiff occurred and

7

Stewart's two-week delay in reporting the incident.

At the conclusion of the investigation, Harold Brabbs counseled Sinks. He told him to stay away from Plaintiff, gave Sinks another copy of the Company's sexual harassment policy and verbally instructed him about the policy. Brabbs also gave Plaintiff another copy of the Company's sexual harassment policy, verbally instructed him about the reporting procedure and told him to immediately report any instances of harassment.

In his deposition, Plaintiff identified several categories of allegedly harassing conduct that supposedly took place before the bathroom incident in July, 1998. The supposedly harassing conduct consisted of:

- Touching Plaintiff's hair;
- Hitting Plaintiff in the backside with a computer keyboard pad;
- Hitting Plaintiff's desk with a computer keyboard pad near the pictures of the dog and cat while saying, "I'm whipping your bitch" and I'm whipping your pussy";
- Making animal noises in Plaintiff's presence; and
- Shooting rubber bands at Plaintiff.

Sinks is known around GM as "the Birdman" because he routinely makes birdcalls. When Sinks supposedly played with Plaintiff's hair, he said he was "trying to build a bird's nest." He never said anything else. Sinks never said anything as he shot the rubber bands. He supposedly just laughed and walked away. Sinks never said anything when he hit Plaintiff with the computer keyboard pad. When Sinks beat on the desk with the mallet, he did not say anything other than I'm whipping your pussy" and I'm whipping your bitch." When Sinks made animal noises, he did not say anything. Plaintiff does not know if the noises were specifically directed toward him.

According to Mr. Brabbs, some years ago the fathers of two summer intern students made

8

sexual harassment charges against Sinks. John Daly and Mr. DiDominick complained that Sinks "was putting himself in a close proximity of Mr. Daly's daughter and Mr. DiDominick's daughter." No formal action was taken against Sinks. The only action take by Mr. Brabbs was Sinks was instructed that, "if you're doing this, stop doing it, and it would be in his best interest to stay away from these girls." Mr. Sinks did not receive any demotion or termination based upon the incidents involving Mr. Daly and Mr. DiDominicks' daughters.

During the period between approximately 1996 through April 1998 Plaintiff informed his Supervisor, John O'Donnell and Frank Oxedine of the actions and comments of Sinks. Despite such Sinks was never fired, demoted or transferred. Rather, Sinks was told "to stay completely away from Plaintiff.

After the bathroom incident, Sinks supposedly walked through Plaintiff's work area, made animal noises and blew smoke in Plaintiff's face on one occasion. Plaintiff did not report this conduct to human resources or labor relations. He also did not tell anyone that he thought he was being sexually harassed. Rather, he only said to Sinks, "Hey, Don't do that. After smoke [sic] is a dangerous thing."

After Plaintiff complained about Sinks Plaintiff claims he reported to O'Donnell that a co-worker had hit him "with his buttocks" and said, "See [t]his is why people should stay out of the area. Someone could get hurt here." In response, O'Donnell told Plaintiff to sit down. When Plaintiff refused to sit down, O'Donnell came "charging into the area, sat at his desk and turned around, pointed his finger at Plaintiff and said, "I told you to sit down." Plaintiff refused to sit down and asked O'Donnell to get his committeeman. O' Donnell called for Plaintiff's committeeman who filed a grievance regarding the incident. Plaintiff was not disciplined after

9

the grievance was written.

On or about April 29, 1999, Plaintiff left work on sick leave. Before leaving, Plaintiff did not report any alleged harassment to anyone at the Company. Rather, Plaintiff approached his supervisor and said, "I got to go home. Give me a slip." He did not give any other reason for leaving work. Plaintiff remained out on sick leave for approximately one year. Plaintiff returned to work on or about April 19, 2000. He left after four or five hours. Before leaving, Plaintiff did not report any alleged harassment to anyone. Rather, he approached his supervisor and said, "I'm not feeling well. I have to leave." He did not say anything else. Plaintiff is currently employed at GM, but has been out on leave since April of 2000.

## JURISDICTION

The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiff's claims arise under the laws of the United States, specifically Title VII of the Civil Rights Act of 1964.

## DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter if law." Fed.R.Civ.P. 56(c); *Cox v. Acme Health Serv., Inc.*, 55 F.3d 1304, 1308 (7th Cir.1995). A genuine issue of material fact exists for trial when, after viewing the record and all reasonable inferences drawn from it in a light most favorable to the non- movant, a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed.2d. 202 (1986); *Hedberg v. Indiana Bell Tel. Co*, 47 F.3d 928, 931 (7th

Cir.1995).

The party moving for summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106,.Ct. 2548, 91 L.Ed.2d. 265 (1986); *Hedberg,* 47 F.3d at 931. If this burden is met by the movant, the non-movant must then set forth specific facts to show that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324. While affidavits, depositions and interrogatories are acceptable evidence for the non-movant to present, these are not the exclusive forms of evidence that can be used in responding to summary judgment. Wright, Miller & Kane Federal Practice and Procedure: Civil 3d § 2721. In deciding a motion for summary judgment, the court must read the facts in a light most favorable to the non- movant. *Cuddington v. Northern Ind. Public Serv. Co.,* 33 F.3d 813, 815 (7th Cir.1994). However, Rule 56(c) mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322. A scintilla of evidence in support of the non-movant's position is not sufficient to oppose successfully a summary judgment motion: "there must be evidence on which they jury could reasonably find for the [non-movant]." *Anderson,* 477 U.S. at 250.

### I. Sexual Discrimination and Hostile Environment - Count I

Title VII of the Civil Rights Act of 1964 provides in part "[i]t shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of ... sex..." 42 U.S.C. § 2000e-2(a)(1) (1994). Title VII is not a "general civility code" for the workplace. *See Oncale v.*

*Sundowner Offshore Svcs, Inc.,* 523 U.S. 75, 81, 118 S. Ct. 998, 1003, 140 L.Ed.2d 201 (1998). Whether a hostile work environment exists is a question of law. *Hardin v. S. C. Johnson & Sons, Inc.* 167 F.3d 340, 345. (1999). Citing *Brooms V. Regal Tube Co.,* 881 F.2d. 412, 420 (7th Cir. (1989).

Sexual harassment is actionable under Title VII only if it is "so severe or pervasive as to alter the conditions of [the victim's] employment and create an abusive working environment." *Clark County School Dist. v. Breeden,* 121 S. Ct. 1508 (2001); *Hostetler v. Quality Dining, Inc.,* 218 F. 3d 798, 806 (7th Cir. 2000). Whether the harassment rises to this level turns on a constellation of factors that include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Hostetler,* 218 F. 3d at 806-07 (internal quotations omitted).

Under the law of the Seventh Circuit, the impact of the harassment upon the plaintiff's work environment is measured both objectively and subjectively. The work environment cannot be described as "hostile" for purposes of Title VII unless a reasonable person would find it offensive and the plaintiff actually perceived it as such. *Id.* (*citing Faragher v. City of Boca Raton,* 524 U.S. 775, 787-88, 118 S. Ct. 2275, 2283, 141 L.Ed.2d. 662 (1998)). When assessing the objective portion of a plaintiff's claim, we assume the perspective of the reasonable victim. *See Ellison v. Brady,* 924 F. 2d 872, 879 (9th Cir. 1991). We must consider any sexually explicit language or stereotypical statements within the context of all the of the evidence of harassment in this case, and then determine whether the evidence as a whole creates a reasonable inference that the plaintiff was discriminated against because of his sex.

If a single incident can ever suffice to support a hostile work environment claim, the incident must be extremely severe. *See,* EEOC Policy Guide, page 6 at 405:6690-91 ("[A] single usually severe incident of harassment may be sufficient to constitute a Title VII violation; the more severe the harassment, the less need to show a repetitive series of incidents. This is particularly true when the harassment is physical."). "[I]solated incidents of sexual horseplay which took place over a period of years were not so egregious as to render [Plaintiff's] work environment hostile. *See also Brooks v. City of San Mateo,* 229 F. 3d 917, 926 (9th Cir.); *Jordan v. Clark,* 847 F. 2d 1368, 1374-75 (9th Cir. 1988); *Del Valle Fontanez v. Aponte,* 660 F. Supp. 145, 146, 47, 147 9D.P.R. 1987)(finding a single incident where defendant "pressed [plaintiff] against the door with his body" and plaintiff" felt defendant's erect sexual organ against her body" twice in a five minute period not severe or pervasive enough to create a hostile working environment); and *Saxton v. American Tel. & Telegraph Co.,* 10 F. 3d 526, 528, 534 (7th Cir. 1993) (finding insufficient harassment to constitute a hostile work environment where plaintiff was rubbed and kissed on one occasion, and resisted an attempted groping on another). Unwelcome touching of an intimate nature falls on the actionable side of the line dividing abusive conduct from behavior which is merely vulgar or mildly offensive. *Hostetler,* 218 F. 3d at 807. With these principles in mind we turn to Plaintiff's arguments taking the facts in a light most favorable to Plaintiff.

In the instant case the most severe conduct Plaintiff complains of is the incident in the bathroom where Sinks pushed up against Plaintiff while his pants were pulled down. There is no dispute that subjectively Plaintiff found such a conduct hostile. However, this court doubts that a reasonable trier of fact could determine that Sink's alleged pushing in the urinal approaches the

13

conduct found actionable in *Hostetler*, which involved a coworker inserting his tongue into the plaintiff's mouth without invitation and nearly removing her brassiere.

Because the incident here was much less severe, we need not answer the question. However, even if the pushing at the urinal were unquestionably actionable behavior, it still cannot form the basis of a sexual harassment claim unless the finder of fact could label the work environment as hostile "notwithstanding the limited number of the acts involved." *Id.* at 808. There is no "magic number" of incidents required to establish a hostile environment. *Id.* Even one act of harassment will suffice if it is egregious. *Id.* Utilizing the *Hostetler* factors of frequency, severity and intensity of interference with working conditions, we cannot conclude that a reasonable man in Plaintiff's position would consider the terms and conditions of his employment altered by Sink's actions. Taking the facts in a light most favorable to Plaintiff it can only be concluded that Plaintiff was harassed on a single occasion for matter of seconds in a way that did not impair his ability to do his job in the long-term especially given that GM took prompt steps to keep Sinks away from Plaintiff.

Furthermore, the incidences of sexual harassment that Plaintiff complains of; Sinks acts of shooting rubber bands at Plaintiff's behind, slapping Plaintiff on the backside with a keyboard cannot be concluded to be "so objectively offensive as to alter the condition of plaintiff's employment." There are isolated incidences of horseplay which took place over an extended period of time. They cannot be concluded to be so egregious as to render Plaintiff's work environment hostile. Furthermore, as the Seventh Circuit reasoned in *Hostetler*:

> Commutatively or in conjunction with other harassment, such acts might become sufficiently pervasive to support a hostile environment claim, but if few and far between they typically will not be severe enough to be actionable in and of

14

> themselves. A hand on the shoulder, a brief hug, or a peck on the cheek lie at one end of the spectrum. Even more intimate or more crude physical acts–a hand on the thigh, a kiss on the lips, a pinch on the buttocks–may be considered insufficiently abusive to be described as "severe" when they occur in isolation. When the harassment moves beyond the sort of casual contact which (if it were consensual) might be expected between friendly co-workers, and manifests in more intimate, intrusive forms of contact, it becomes increasingly difficult to write the conduct off as a pedestrian annoyance.

*Id.* (internal citations omitted).

We find that the remaining conduct Plaintiff attributes to Sinks fails to raise an issue of fact as to a sexually hostile work environment. Indeed, the only comments Sinks ever made of a sexual nature were those made about the pictures of the cat and dog. Putting aside for the moment Plaintiff's allegations with respect to Sinks' behavior in the bathroom, none of the acts of which Plaintiff complains are sexual in nature or appear to be in any way related to Plaintiff's gender. As the Supreme Court has reiterated, Title VII prohibits an employer from discriminating against an employee with respect to "compensation, terms, conditions, or privileges" of employment "because of such individual's ...sex." *See Oncale,* 523 U.S. at 78 (citing 42 U.S.C. § 2000e-2(a)(1)); *accord Penry v. Federal Home Loan Bank,* 155 F. 3d 1257, 1261 (10th Cir. 1998)(same). In determining whether workplace harassment constitutes discrimination "because of sex," the 'critical issue ...is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed. *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 25, 114 S. Ct. 367, 372, 126 L.Ed.2d. 295 (1993). On this record there is simply no evidence that male workers at GM are exposed to disadvantageous terms or conditions of employment to which female workers are not exposed. Moreover, the only other comment Sinks made directly to Plaintiff was that he was "trying to

15

build a bird's nest" in Plaintiff's hair. These comments, while arguably sophomoric, peculiar and inappropriate, do not create an environment that a reasonable person would find threatening or harassing. Finally, this circuit has explained that there is no "automatic inference" that the use of the word "bitch" is "motivated by...gender rather than by personal dislike unrelated to gender." *Galloway v. General Motors Servs. Parts Operations,* 78 F. 3d 1164, 1168 (7th Cir. 1996). In the end, Plaintiff's argument that the alleged incidents of sexual harassment are severe seems to rest entirely on the fact that he subjectively viewed the incidents as such.

Finally, even if the most egregious conduct Sinks engaged in, the pushing of Plaintiff at the urinal, could be concluded to be actionable sexual harassment, GM cannot be liable because once GM became aware of Sink's conduct it responded immediately when Plaintiff complained on July 8, 1998.

An employer may be liable for harassment of a co-worker only if it "was negligent either in discovering or remedying the harassment." *Parkins v. Civil Constructors, Inc.,* 163 F. 3d 1027, 1032 (7th cir. 1998). The reasonableness of the employer's response is measured against how much it knows or should have known, as well as the seriousness of the alleged harassment. *See, e.g. Fuller v. Caterpillar, Inc.,* 2000 WL 147411 (N.D. Ill. Oct. 4, 2000)(citing *Perry v. Harris Chernin, Inc.,* 126 F. 3d 1010, 1013 (7th Cir. 1997). An employer's legal duty in co-employee harassment cases will be discharged if it takes reasonable steps to discover and rectify any harassment of an employee. *Perry v. Harris Chernin, Inc.,* 126 F. 3d 1010, 1013 (7th Cir. 1997).

In the present case, the harasser was a co-worker. Under the standard for co-employee harassment, an employer's legal duty is discharged if it takes reasonable steps to discover and rectify the harassment. *Parkins,* 163 F. 3d at 1035. However, courts have found that it is

16

unrealistic to expect management "'to be aware of every impropriety committed by every low-level employee.'" *Id.* Thus, the Seventh Circuit has determined that notice of knowledge of the harassment is a prerequisite for liability. *Parkins,* 163 F. 3d at 1035. In determining whether an employer has notice, the court must first determine whether the employer has a designated channel for employees to bring their harassment complaints. *Id.* To withstand summary judgment a plaintiff must present evidence that [h]e gave [his employer] enough information to make a reasonable employer think there was some probability that [h]e was being sexually harassed. *Id.*

On this record, there is simply no evidence that anyone in upper management of GM had any inkling that Sinks was engaging in behavior that could be construed by Plaintiff to be sexual harassing in nature until the bathroom incident. The record supports the conclusion that once GM became aware of Sink's behavior GM immediately responded to Plaintiff's complaints about Sinks. The undisputed evidence establishes that once Plaintiff complained to O'Donnell about the incident a course of action was embarked upon by GM. More specifically, in response to Plaintiff' complaint, GM commenced an investigation. Within one week, O'Donnell had counseled Sinks to stay away from Plaintiff, made Sinks apologize to Plaintiff and removed the pictures of the kitten and the puppy that Plaintiff had complained about. Sinks was given a copy of GM's sexual harassment policy and verbally instructed him about the policy. To be sure, Sink's behavior in the bathroom was inappropriate, but reading this record in a light most favorable to Plaintiff, a rational jury could only find that GM promptly responded to Plaintiff's sexual harassment complaint. Therefore, summary judgment is granted in favor of GM as to Count I.

## II. Individual Disparate Treatment Claim - Count II

In Count II of his complaint Plaintiff claims that GM discriminated against him on the basis of his sex by failing to investigate his complaint in the same manner as it investigated the complaints of two young women. To establish a prima facie case of sex discrimination, Plaintiff must show, among other things, that defendant treated similarly situated female employees more favorably. *See Greenslade v. Chicago Sun-Times, Inc.*, 112 F. 3d 853, 863 (7th Cir. 1997). Here, the undisputed evidence reveals that GM responded to complaints about sexual harassment by the female summer interns by taking the same steps GM took in response to Plaintiff's complaints. Specifically, GM conducted an investigation which included interviewing the summer interns, Sinks and any witnesses. The investigation was inconclusive and Sinks was instructed to stay away from the summer interns. Hence, summary judgment is granted in favor of GM as to Plaintiff's disparate treatment claim.

## III. Retaliation - Counts III and IV

In counts III and IV of his complaint Plaintiff alleges that he was retaliated against because of his sexual harassment complaint. In order to avoid summary judgment on his retaliation claim, Plaintiff must show that 1) he engaged in a statutorily protected activity; 2) he suffered an adverse employment action; and 3) there is a causal link between the protected activity and the adverse action. *Essex v. United Parcel Service*, 111 F.3d 1304, 1309 (7th Cir.1997); *McKenzie v. Illinois Department of Transportation*, 92 F.3d 473, 483 (7th Cir.1996).

The Seventh Circuit has held that an adverse employment action is indicated by a termination of employment, a demotion evidenced by a decrease in wages or salary, a less distinguished title, a material loss of benefits, or significantly diminished responsibilities. *Dey v.*

*Colt Construction and Development Co.,* 28 f.3d 1446 (7th Cir.1994). Minor changes in the routine for one single day does not rise to the level of an adverse employment action. *Smart v. Ball State University,* 89 F.3d 437, 441 (7th Cir.1996). Plaintiff argues that he was subjected to an adverse employment action "because after he reported the July, 1998 bathroom incident GM failed to take any steps to discover or remedy the harassment from Sinks. Plaintiff cites no authority in support of such legal argument. *See Tyler v. Runyon,* 70 F. 3d 458, 466 (7th Cir. 1995). Furthermore, there is no evidence that the terms or conditions of Plaintiff's employment were altered in any manner whatsoever. Because Plaintiff has failed to demonstrate that he suffered an adverse employment action summary judgment is granted in favor of GM as to Counts III and IV.

## CONCLUSION

For the foregoing reasons, Defendant GM's motion for summary judgment on plaintiff's four count complaint brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), et seq., for sexual harassment, individual disparate treatment and retaliation, is GRANTED (#26-1). This case is terminated and this is a final and appealable order.

SO ORDERED

ENTERED: 6/19/01

HON. RONALD A. GUZMAN
**United States Judge**